IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | |
|---|---|
| GAGE RICKS, on Behalf of Himself and on behalf of all Others Similarly Situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BTA OIL PRODUCERS, LLC<br><br>　　　　Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ 　CIVIL ACTION NO.:7:21-CV-206<br>§<br>§<br>§<br>§ |

**PLAINTIFF'S MOTION FOR DISTRIBUTION OF
NOTICE TO POTENTIAL OPT-IN PLAINTIFFS**

### I.　　INTRODUCTION

**A. Summary of Relief Requested**

Plaintiff Gage Ricks filed this Fair Labor Standards Act ("FLSA") action on November 3, 2021 against his former employer BTA Oil Producers, LLC ("Defendant" or "BTA"). Plaintiff Ricks worked for BTA as a pumper, a blue-collar position in BTA's production department responsible for monitoring the condition of the wells serviced by BTA. The gravamen of Plaintiff's complaint is the failure of BTA to pay Plaintiff and other pumpers the proper amount of overtime because BTA failed to pay its pumpers for all the hours they worked.

Pursuant to BTA's uniform employment policies applicable to pumpers, Plaintiff worked an 8 day on, 6 day off schedule. His base schedule was a ten-hour workday, from 7 AM to 5 PM. During that ten-hour workday, Plaintiff traveled to the various wells on his assigned route to ensure those wells were producing properly and the pumping equipment on those well sites was operating according to BTA's specifications.

1

Following the conclusion of his ten-hour workday, BTA placed Plaintiff on-call. During the on-call shift, BTA considered Plaintiff to be off-the-clock for payroll purposes, however BTA still required Plaintiff to work a considerable amount of time nearly every day.

The wells BTA's pumpers monitor are connected to various Supervisory Control and Data Acquisition ("SCADA") systems.  These SCADA systems remotely monitor the status of the wells, including issues with pressure, tank level, or pump functionality.  Every pumper has a BTA issued phone and during their stand-by shifts receives a text message from the SCADA system when there is any issue with a well site on that pumper's route. Upon receiving the text, the pumper can electronically access the battery in question and attempt to resolve the issue remotely. If the issue cannot be resolved remotely, the pumper then has to travel to the well site to troubleshoot in person.  Generally, BTA only treats the time a pumper travels on a "call out" during his on-call time as compensable work.  This time is reflected on a time sheet as a "call out."  However, unlike "call outs," the time a pumper like Plaintiff otherwise spends during his "on call" shift acknowledging and responding to the various alerts received from the SCADA system is not treated as time worked by BTA.  As a result, BTA underpays, often significantly, its pumpers because the time spent by a pumper—even if it does not result in a call out—in responding to SCADA system alerts during stand-by time should have been treated by BTA as hours worked.

Plaintiff now seeks an order from the Court granting permission to send court authorized notice pursuant to *Hoffman-LaRoche* to appraise BTA's other pumpers of the existence of this lawsuit and afford them an opportunity to join. There are 30 other pumpers that would be eligible to join this case. Plaintiff's proposed  notice is attached hereto as Exhibit 1.

### B. Certification Discovery

The parties agreed to conduct certification discovery in this case (Doc.10). To that end, BTA produced a list of the pumpers that could be potential opt-in plaintiffs. BTA has produced the SCADA alert records, time records, and pay records for 20% of the class.[1] BTA deposed Plaintiff Ricks and Plaintiff deposed two witnesses produced pursuant to Rule 30(b)(6) on issues germane to certification.

## II.    FACTUAL AND LEGAL BACKGROUND

### A. BTA pays all of its pumpers the same way—on an hourly basis.

BTA's controller, Greg Groves testified that all of BTA's pumpers are paid on an hourly rate basis:

> Q.    Mr. Groves, could you please tell me how BTA compensates its pumpers?
> A.    Yes sir. We—they have an established—you know, each pumper has an established rate that they agreed to upon employment; and then based on the time they turn into us in terms of what they've worked, we take those hours and apply the pay rate and pay them.
> Q.    So when you say there's an agreed rate, that's an hourly rate, correct?
> A.    With regard to the pumpers, yes, that's correct.
> . . .
> Q.    Does BTA guarantee its pumpers a set amount of payment per week or is payment based solely on the number of hours that they worked?
> A.    My understanding is solely on number of hours worked.
> Q.    Okay. And that's the same for all the pumpers, correct?
> A.    Yes, sir, correct.

(Exhibit 2, Groves Deposition, at 8:2-23). Because BTA pays its pumpers on an hourly basis, none of the FLSA's white collar exemptions can apply because a prerequisite of each of those

---

[1] The records BTA produced for the pumpers other than Plaintiff were, per agreement, produced anonymously. Throughout this motion those pumpers will be referenced by employee number instead of name.

3

exemptions is payment on a salary basis. *See* 29 C.F.R. 541.100(a)(1) (executive exemption); 29 C.F.R. 541.200(a)(1) (administrative exemption); 29 C.F.R. 541.300(a)(1) (professional exemption).

Furthermore, all of BTA's pumpers report their time using the same online portal (Exhibit 2, Groves Deposition at 11:16-12:6), have their time and pay processed by the same BTA employee (*id.* at 13:10-13:23) and are paid on the same days (*id.* at 14:8-14:13). Additionally, all of BTA's pumpers work the same ten hour day, from 7 AM to 5 PM and then go on a standby shift subject to recall by a SCADA notification. (Exhibit 3, Jones Deposition, at 20:15-25).

### B. All of BTA's pumpers perform the same general duties.

BTA testified that, with some variation due to the type of lift mechanism on a given well, all of its pumpers perform the same general duties. (Exhibit 3, Jones Deposition, at 9:19-10:12). That is generally, a pumper is responsible for ensuring that all the equipment at their assigned well sites are functioning properly. (*Id.*). While BTA does not have a written job description for the pumper position, it does have one for a production foreman, which is one step removed from a pumper in BTA's chain of command. BTA acknowledged that there was significant overlap between what a pumper does and what a production foreman does. (*Id.* at 18:4-19:16; Exhibit 4, Production Foreman job description). Per that description, all of BTA's pumpers are responsible for monitoring the SCADA system through the day, ensuring necessary maintenance is performed on all the equipment, managing oil and water inventories, providing emergency response in the event of a spill, responding to alarms in a timely fashion, and actively monitoring production and work progress.

### C. All of BTA's pumpers were subject to the same policy to not pay for SCADA notifications.

BTA uses various SCADA systems that remotely monitor tank levels, well pressure, and other issues at the well site. (Exhibit 3, Jones Deposition, at 33:4-14). All of BTA's pumpers have access to a SCADA system in order to perform their work. (*Id.* at 33:15-21).

BTA testified that all of its pumpers, regardless of region, are responsible for responding to SCADA alerts. (Exhibit 3, Jones Deposition, at 27:16-28:18). As described by BTA's production superintendent, all of the SCADA systems employed by BTA are web based and send the pumper a text alert on a company issued cellular phone when an issue arises at the well site. (Exhibit 3, Jones Deposition, at 34:10-17). That text message contains a brief description of the issue at the well. (*Id.* at 34:18-35:6). Once a pumper receives an alert, he has 30 minutes to acknowledge the alert and one hour to get to the well site if the alert is one that cannot be resolved remotely. (*Id.* at 35:7-35:18). The text alert contains a hyperlink through which the pumper can remotely access the battery that triggered the alert to further troubleshoot the cause of a given alert. (*Id.* at 36:6-37:25). Many issues at the well can be resolved remotely, such as clearing communication faults or remotely restarting a pump. *Id.* Of course, accessing the SCADA system, locating the issue, making a troubleshooting determination, and acting on that determination take time, especially when a pumper is roused from his sleep in the middle of the night and tasked with making these determinations.

The records BTA produced as part of the agreed certification discovery demonstrate that all its pumpers routinely fielded SCADA system alerts in the middle of the night or after their normal work schedule. As BTA testified, the set daily schedule of a pumper is a ten-hour day, from 7 AM to 5 PM, for which a pumper records and is paid for 10 hours of work. Accordingly, on days in which a pumper only recorded working 10 hours but responded to SCADA system

alerts in the night, the pumper was not paid for all of his hours worked. In fact, for nearly every day when a pumper was paid for his bare ten-hour base schedule, he would also have alerts he had to acknowledge after the nominal 5 PM end of his day.

For example, BTA paid Plaintiff Ricks for working 10 hours on March 10, 2021 for his normal 7AM to 5PM (Exhibit 5, at BTA 147) work but his SCADA system records show that he responded to alerts at 4:55 AM. 5:29 AM (*Id.* at BTA 2293).  Likewise, on February 18, 2021, BTA paid Plaintiff Ricks for his typical 7AM to 5 PM  10 hour workday (*Id.* at BTA 146), but also required that he respond to SCADA system alerts at 4:00 AM, 4:27 AM, and 9:09 PM (*Id.* at BTA 2324).

BTA produced anonymized SCADA system records and time records for other pumpers and their records also show frequent responses to SCADA alerts outside of the normal 10 hour 7AM to 5PM workday, for example:

- Pumper 5 on June 15, 2021 (Exhibit 6, at BTA 784) was paid for a normal 7AM to 5PM 10 hour work day but also responded to SCADA system alerts at 5:45 PM, 6:12 PM, 6:28 PM, 7:16 PM, 7:17 PM, 7:23 PM, 7:27 PM, 7:29 PM, 7:50 PM, 7:56 PM, 8:47 PM, 9:13 PM, 9:19 PM, 9:47 PM, 10:08 PM, 11:42 PM (Exhibit 6, at BTA 3407)

- Pumper 14 on June 23, 2021 (Exhibit 7, at BTA 912) was paid for a normal 7AM to 5PM 10 hour work day but also responded to SCADA system alerts at  8:56 PM, 9:13 PM, and 10:06 PM (Exhibit 7, at BTA 3862)

- Pumper 16 on April 3, 2021 (Exhibit 8, at BTA 999) was paid for a normal 7AM to 5PM 10 hour work day but also responded to SCADA system alerts at 1:29 AM, 1:36 AM, 2:23 AM, and 5:55 PM (Exhibit 8, at BTA 4153)

- Pumper 17 on October 10, 2021 (Exhibit 9, at BTA 1113) was paid for a normal 7AM to 5PM 10 hour work day but also responded to SCADA system alerts at 2:05 AM, 2:07 AM, 2:14 AM, 3:33 AM, 6:33 AM, 5:58 PM, 6:54 PM, 8:33 PM, and 9:44 PM (Exhibit 9, at BTA 2488-89)

- Pumper 21 on April 11, 2021 (Exhibit 10, at BTA 1230) was paid for a normal 7AM to 5PM 10 hour work day but also responded to SCADA system alerts at 1:10 AM, 1:14 AM, 9:30 PM, 9:35 PM, 9:40 PM, 9:47 PM, and 10:27 PM (Exhibit 10, at BTA 1867-1868).

**D. The liability frame work is the same for Plaintiff and BTA's other pumpers.**

Under the FLSA, employees are guaranteed minimum wage for all time worked and overtime pay for all time worked over 40 hours a week. 29 U.S.C. § 207(a)(1). Not long after the FLSA's enactment in 1938, disputes arose concerning whether the time that employees were required to be on the premises of their employers, but during which they were allowed to sleep, should be included in calculating hours worked. *See, e.g., Strand v. Garden Valley Tele. Co.,* 51 F. Supp. 898, 902-04 (D. Minn. 1943); *Whitsitt v. Enid Ice & Fuel Co.,* 6 Labor Cases ¶ 61,226 (W.D. Okla. 1942), *cited in* 29 C.F.R. § 785.21. As it has for many issues to which the FLSA does not speak directly, the DOL has addressed sleep-time issues in regulations it has promulgated and in opinion letters and other forms of guidance. *See, e.g., Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) ("[R]ulings, interpretations and opinions of the Administrator [of the FLSA] . . . constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."). Those regulations, and clarifications of those regulations, are entitled to deference unless unreasonable. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."); *Auer v. Robbins,* 519 U.S. 452, 461 (1997) (holding that the Secretary of Labor's interpretation of an FLSA regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation'" (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359 (1989))).

The applicable regulation in this case is 29 C.F.R. § 785.22, which provides:

> (a) General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona

> fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.
> (b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisons have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

As this regulation provides, when an employee is required to be on duty for 24 hours or more, as is the case with all of BTA's pumpers because they work a uniform 6 on 8 off schedule, an employer must pay when the designated rest period is interrupted. Here, BTA routinely interrupted the rest period of all its pumpers by requiring that they respond to SCADA system alerts. BTA violated the FLSA by not treating all the time Plaintiff Ricks spent responding to his alerts as time worked. It violated the FLSA by doing the same to the rest of its pumpers.

### III.     ARGUMENTS AND AUTHORITIES

In *Hoffman-La Roche*, the Supreme Court held that district courts have the discretion to certify a class and issue orders authorizing notice to potential members of a collective action of the opportunity to "opt-in." 493 U.S. at 169. The key issue is whether the persons to whom notice would go are "similarly situated" to Plaintiffs. *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 583 (6th Cir. 2009); *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001); 29 U.S.C. § 216(b).

Until January of 2021, district courts within the Fifth Circuit primarily used the "*Lusardi* two-stage approach" to certify collectives under Section 216 of the FLSA. *See Segovia v. Fuelco*

*Energy LLC*, No. SA-17-CV-1246-JKP, 2021 U.S. Dist. LEXIS 101258, at *16 (W.D. Tex. May 28, 2021). Under *Lusardi v. Xerox, Corp.*, 118 F.R.D. 351 (D. N.J. 1987), collective action certification is divided into two phases: (1) the notice stage; and (2) the opt-in, or merits, stage. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-1214 (5th Cir. 1995). In the first stage, courts would determine whether the plaintiff had provided sufficient evidence of similarly-situated plaintiffs to warrant court-facilitated notice. *Valcho v. Dallas Cnty. Hosp. Dist.*, 574 F. Supp. 2d 618, 621 (N.D. Tex. 2008). If so, the court then "conditionally certified" the class and facilitated notice to the potential plaintiffs. *Id*. In the second stage, after discovery and opt-in periods have taken place, the court would then reexamine the class, typically in response to a motion for decertification. *Valcho*, 574 F. Supp. 2d at 621.

The Fifth Circuit's decision in *Swales v. KLLM Transport Services, LLC*, 985 F.3d 430 (5th Cir. 2021) effectively eliminated the first step in the two-stage analysis while maintaining the standards set forth in the second step. *Segovia*, 2021 U.S. Dist. LEXIS 101258, at *21 ("Although *Swales* brings step-two of *Lusardi* to the forefront of FLSA collective actions, it does not alter the meaning of 'similarly situated' as honed and considered through judicial decisions since the phrase first appeared undefined in the statute."). Factors to consider when determining whether a class is "similarly situated" such that a collective may be certified include: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Hernandez v. Pritchard Indus. (Southwest), LLC*, No. SA-20-CV-00508-XR, 2021 U.S. Dist. LEXIS 56675, at *5 (W.D. Tex. Mar. 25, 2021) (quoting *Badon v. Berry's Reliable Res., LLC*, No. 19-12317, 2021 U.S. Dist. LEXIS 45688, at *5 (E.D. La. Mar. 11, 2021)); *see also Swales*, 985 F.3d at 437 (quoting *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)).

Notably unchanged by *Swales* is the principle that "similarly situated" does not mean "identically situated." *Segovia*, 2021 U.S. Dist. LEXIS 101258, at *22. Plaintiffs are not required to "establish identical situations to carry their burden to show 'similarly situated.'" *Id.* (citing *Vanzzini v. Action Meat Distribs.*, 995 F. Supp. 2d 703, 720 (S.D. Tex. 2014)). Rather, a plaintiff must show "similarity among the individual situations." *Id.* (citing *Vanzzini*, 995 F. Supp. 2d at 720). This may be done by "showing 'some factual nexus which binds' them and [potential] opt-in plaintiffs . . . as alleged victims of a particular policy or practice." *Id.* (quoting *Vanzzini*, 995 F. Supp. 2d at 720; citing *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008)). Indeed, "[e]ven if there are 'numerous differences between individual plaintiffs,' such differences will not preclude a collective action unless they are material to ultimate issues before the trial court." *Id.* (quoting *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014)).

### A. Plaintiff and BTA's other pumpers share common liability facts and a common employment setting.

The first factor the Court may consider is the "disparate factual and employment settings of the individual plaintiffs." *Hernandez*, 2021 U.S. Dist. LEXIS 56675, at *5. Plaintiff and BTA's other pumpers share the same job title, performed virtually identical duties, were all uniformly paid an hourly rate, were all subject to the same kind of after-hours SCADA system monitoring duties. No matter where a pumper worked, he was subject to the same FLSA violating policies as Plaintiff—that is BTA required all of its pumpers to work for free after hours to respond to SCADA system alerts.

The liability question for Plaintiff and any other pumper that exercises his right to join this case is the same: Did BTA pay for all the hours that pumper actually worked? The answer to that question can uniformly be found in BTA's own records, particularly by comparing the hours it

10

claims each pumper worked and the SCADA system records that show the frequency with which a pumper had his off-time interrupted by responding to alerts.

### B. There are no defenses unique to individual pumpers.

In light of the substantial similarity among BTA's pumpers, there are no defenses that BTA might raise that would be unique to any individual pumper. Significantly, BTA acknowledges that its pumpers are hourly employees. Because they are hourly, none of the FLSA's white collar exemptions can apply. All the pumpers were paid the same way and all the pumpers did not receive the entirety of their compensation because of BTA's policy of not paying for SCADA system alerts. Any defense that BTA may raise against Plaintiff may just as easily be asserted against the claims of any other pumper. The pumpers are so similarly situated that any defense BTA believes it may have can be adjudicated on a class-wide basis, such as issues of good faith or willfulness.

### C. Fairness and procedural considerations favor a collective trial.

The law favors collective actions because they allow for the "efficient resolution in one proceeding of common issues of law and fact" and "lower individual costs to vindicate rights by the pooling of resources," thereby benefiting both the court and the litigants. *Hoffmann-La Roche*, 493 U.S. at 170. As one court in the Western District of Texas put it, "[p]roceeding collectively always poses certain logistical challenges, . . . [b]ut the alternative—more than two dozen individual trials litigating largely the same liability issues and defenses—is less efficient, less expedient, and simply unnecessary." *Clark*, 44 F. Supp. 3d at 691.

As discussed above, all members of the collective held the same job title, performed substantially the same work, and have similar claims against Defendant. BTA treated the members of the collective similarly in terms of pay and compensation (or lack thereof) for after-hours SCADA system alert responses. The Eleventh Circuit has observed that "[t]here is nothing unfair

about litigating a single corporate decision in a single collective action." *Morgan*, *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1264 (11th Cir. 2008). On the other hand, scheduling thirty trials would be grossly inefficient for the Court, prohibitively expensive for the class, and could result in contradictory conclusions regarding Defendant's defenses. The principal issue at trial will be whether BTA's policy of not treating SCADA system alters as time worked was consistent with the FLSA. The evidence and legal analysis required to address this issue at trial will be the same for all class members. As such, collective adjudication will also serve the purposes of the FLSA in reducing the burden on the class through the pooling of resources, and efficiently resolving common issues of law and fact that arise from the same illegal conduct. Therefore, fairness and procedural considerations weigh in favor of certification of this collective action for trial.

This Court found certification appropriate in a similar post-*Swales* case in *Collins v. Pel-State*, No. 7:20-CV-00083-DC-RCG, 2021 U.S. Dist. LEXIS 220336 (W.D. Tex. Sep. 29, 2021). In that case, the underlying liability issue was unpaid time for oil field workers spent in transit to the job site. In that case, the Court granted certification because the Plaintiff and the potential class members shared the same job titles, performed the same job duties, and were subject to the same work expectations. *Id.* at *9. Additionally, the employees in *Collins* were subject to the same alleged policy that resulted in uncompensated work time. *Id.* The facts here are much the same. All of BTA's pumpers are paid hourly. All of BTA's pumpers perform the same general duties, including the requirement to respond to SCADA system alerts after hours. As in *Collins*, certification is appropriate here.

### D. The proposed notice is timely, accurate and informative.

A collective action depends "on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about

whether to participate." *Hoffmann-La Roche*, 493 U.S. at 170. Use of court-authorized notice also prevents "misleading communications." *Id.* at 172. Plaintiff's proposed court-approved notice, Exhibit 1, to the potential opt-ins is "timely, accurate, and informative," as required. *Id.* It provides notice of the pendency of the action and of the opportunity to opt in. Plaintiff's legal claims are accurately described. Potential opt-ins are advised that they are not required to participate. The notice provides clear instructions on how to opt-in and accurately states the prohibition against retaliation or discrimination for participation in the FLSA action. *See* 29 U.S.C. § 215(a)(3).

### E. The notice should be sent via regular mail, via email, and via text message.

The point of sending out notice to class members is for them to receive it, become aware of the pending litigation, and make a decision regarding joining the case. *Hoffmann-La Roche*, 493 U.S. at 170. In accordance with the purpose of the notice process, Plaintiff proposes that the notice and consent forms be mailed by first class mail, by electronic mail, and by text message to all current and former pumpers employed by Defendant at any time from three years prior to the granting of this Motion to present.[2] Sending the Notice of Rights and Consent Form via these

---

[2] Email notice is a common form of notification in FLSA cases. *Jones v. JGC Dallas LLC*, 2012 U.S. Dist. LEXIS 185042 (N.D. Tex. Nov. 29, 2012)(rep. and recommendation adopted, 2013 U.S. Dist. LEXIS 8865 (N.D. Tex. Jan. 23, 2013)) ("The attached form of notice should be approved by the Court, as should Plaintiffs' request to provide notice to the conditionally certified class via regular mail and email in the manner described above."); *See Phelps v. MC Comm'ns, Inc.*, 2011 U.S. Dist. LEXIS 84428 (D. Nev. Aug. 1, 2011)(The Court will permit Plaintiffs to email the notice to those employees for whom Defendants have email addresses, as well as send it by first class mail. Email is an efficient, reasonable, and low-cost supplemental form of notice, particularly where Defendants may lack current physical mailing address information for its former employees.); "The court concludes that the names, addresses, phone numbers, and email addresses of technicians are sufficient to permit notice and communication with potential members of the putative collective action."); *Beall v. Tyler Techs., Inc*., 2009 U.S. Dist. LEXIS 52990 (E.D. Tex. June 23, 2009)(Court granted class notice via email.); *Eggleston v. Sawyer Sportsbar, Inc.*, 2010 U.S. Dist. LEXIS 65022 (S.D. Tex. June 28, 2010)(Court granted class notice via email); *In re Deloitte & Touche, LLP*, 2012 U.S. Dist. LEXIS 12641 (S.D.N.Y. Jan. 17, 2012); *White v. Integrated Elec. Techs., Inc.*, 2013 U.S. Dist. LEXIS 83298 (E.D. La. June 13, 2013)("Plaintiffs have submitted ample authority indicating that federal district courts, including courts in the Eastern District of Louisiana and the Fifth Circuit, frequently utilize email to provide notice of collective actions to potential class members."); *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 575 (D. Md. 2012)("Plaintiffs may, therefore, notify other potential plaintiffs of this action by first-class mail and by email...").

three methods will ensure that the class member receives the notice, becomes aware of the litigation, and makes a decision regarding joining the case.

While individuals may move from residence to residence, a person's email address typically does not change. Further, while mail correspondence may be lost, stolen, or not forwarded to a new address, email correspondence is secure, reliable, and password protected. Accordingly, email communication is an equally if not more reliable method of communicating to the class members the pendency of this action. The subject line of the email notice would read "Important Notice Re: Wage Lawsuit Against BTA." The body of the email would include the language of the Notice of Rights. The Consent Form would be attached to the email or available through a hyperlink and available for electronic execution via a hyperlink in the body of the email.

It is undisputed that "we live in a time when all manner of commercial transactions are routinely cemented by electronic submission." *Mraz v. Aetna Life Ins. Co.,* 2014 WL 5018862, at *5 (M.D. Pa. Oct. 7, 2014). In fact, this Motion is being filed through the federal court system's electronic case filing system and all parties are served via email notice precisely because it is an instantaneous, inexpensive, and secure way to communicate. With this in mind, a large number of courts have authorized email notice. "With regard to the use of email to notify potential plaintiffs of this litigation, 'communication through email is [now] the norm.'" *Butler v. DirectSAT USA, LLC,* 876 F. Supp. 2d 560, 575 (D. Md. 2012). "Acknowledging its efficacy and common usage, courts increasingly have authorized notice by email in FLSA cases." *Landry v. Swire Oilfield Servs., L.L.C.,* 2017 U.S. Dist. LEXIS 66497, *121 (D.N.M. May 2, 2017) (approving email notice). "Email is an efficient, reasonable, and low-cost supplemental form of notice." *Phelps v. MC Communications, Inc.*, 2011 WL 3298414 *6 (D. Nev. Aug. 1, 2011). The disclosure of email addresses is not "unduly intrusive on the privacy and personal interests of class

members." *Jones v. JGC Dallas LLC,* 2012 WL 6928101 at *5 (N.D. Tex. Nov. 29, 2012). Without email notice, the notices are more likely to be returned due to outdated or inaccurate addresses. This in turn may result in Plaintiff requesting an extension of the opt-in period to accommodate those class members, thereby delaying the timely resolution of this matter. Email notice is especially appropriate in a case such as this where it is undisputed that the nature of the work of the class members requires that the be away from their homes for an extended period of time while they perform their duties for Defendant or companies like Defendant.

The same reasoning that applies in allowing email notice makes notice via text message also appropriate. Courts similarly have authorized notice by text message, observing that such notice "is likely to be a viable and efficient means of communicating with many prospective members of [a] collective action." *Landry,* 2017 U.S. Dist. LEXIS 66497, *121 (D.N.M. May 2, 2017). As one court put it, "[i]ndeed, given the amount of junk mail that people receive, email and text message likely are more effective methods for communicating with potential class members than traditional, first-class mail." *Id.*; *see also*, *Bhumithanarn v. 22 Noodle Mkt. Corp.,* 14-CV-2625 RJS, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015); *Chamorro v. Bahman Ghermezian,* No. 12–cv–8159 (TPG), ECF No. 17 ¶ 5 (S.D.N.Y. Feb. 25, 2013) (authorizing dissemination of FLSA § 216(b) notice via text message).

The text message would read "Important Notice Regarding Lawsuit Against BTA. To read more about it or join the Lawsuit click this link [*link to Notice of Rights and Consent Form*]." Given the purpose of the FLSA's notice, this Court should allow the class members to receive the notice via mail, email, and text message to ensure class members receive the notice, review the notice, and make an informed decision on whether to join the lawsuit.

### F. The notice process should be approved.

Plaintiff requests that within ten (10) days of granting conditional certification, Defendant be ordered to produce in a computer readable format such as an excel spreadsheet the names, all known addresses, all phone numbers (home, mobile, etc.), all known email addresses (work and personal), and dates of employment for all the class members employed at any time during the three years preceding the granting of this Motion to the present ("Class List").

Plaintiff's counsel will oversee the notice process (regular mail, electronic mail, and text message notice) and pay the up-front charges for same (postage, copying, etc.).  Within ten (10) days of the production of the Class List, Plaintiff's counsel will mail, email, and text the Notice of Rights and Consent Form attached hereto as Exhibit 1.

Those class members interested in participating would be required to return consents to Plaintiff's counsel for filing with the Court within 60 days of the mailing.  *Graham v. Jet Specialty, Inc.*, No. MO-15-CV-135-DAE, 2016 U.S. Dist. LEXIS 3420, at *22 (W.D. Tex. Jan. 11, 2016) (recognizing that a 60 day opt-in period is the default notice period); *Parker v. Silverleaf Resorts, Inc.*, No. 3:14-CV-2075-B, 2017 U.S. Dist. LEXIS 65638, at *40 (N.D. Tex. May 1, 2017).  After 30 days from the original mailing, Plaintiff requests that it be allowed to send a second Notice of Rights and Consent Form as a reminder to those class members who have not yet opted into the lawsuit.  Such reminder notices would only go to those class members who have not opted in. "Those courts that allow a reminder emphasize that it serves the FLSA's broad remedial purpose by ensuring that 'as many potential plaintiffs as possible [are informed] of the collective action and their right to opt-in.'"  *Landry,* 2017 U.S. Dist. LEXIS 66497, *122 (D.N.M. May 2, 2017) (*citing*, *Chhab v. Darden Rests., Inc.,* 2013 U.S. Dist. LEXIS 135926, at *51).

**G. Opt-in Plaintiffs should be allowed to Execute the Consent Form Electronically.**

Plaintiff further requests that the class members be given the option to execute their consent forms online through an electronic signature service. This service allows class members to sign their consent forms electronically by clicking on a link, which in turn takes them to a website where they can review the document they are signing, click a box indicating they have read and understood the consent form and insert information such as their name and address. Users are instantaneously provided with a PDF copy of the form they signed and a copy of the form is made accessible to Plaintiff's counsel who will, in turn, file same with the Court, just as if such document had been received via regular mail. This would merely be an additional option for signing the consent form.

"Courts have approved the use of online, electronic signature opt-in forms." *Landry,* 2017 U.S. Dist. LEXIS 66497, *122 (D.N.M. May 2, 2017); see, e.g., *Dyson v. Stuart Petrol. Testers, Inc.,* 308 F.R.D. at 517; *Bland v. Calfrac Well Servs. Corp.,* 2013 U.S. Dist. LEXIS 113094, at *3 (W.D. Pa. 2013); *White v. Integrated Elec. Techs., Inc.,* 2013 U.S. Dist. LEXIS 83298, at *9 (E.D. La. 2013). As one court put it, "we live in a time when all manner of commercial transactions are routinely cemented by electronic submission." *Landry,* 2017 U.S. Dist. LEXIS 66497, *122 (D.N.M. May 2, 2017) (citing *Mraz v. Aetna Life Ins. Co.,* 2014 U.S. Dist. LEXIS 142923, at *5). Under the Electronic Signatures in Global and National Commerce Act "with respect to any transaction in or affecting interstate or foreign commerce" a "signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a)(1). Electronic execution of legal documents is binding, and convenient for the user and as such should be allowed.

## IV.  CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court grant his Motion for Distribution of Notice to Potential Class Members and enter an order granting the following:

1. Certifying this matter as a collective action under 29 U.S.C. § 216(b) with respect to all current and former pumpers who worked for Defendant from three years prior to the date of the signing of an Order to the present;

2. Ordering Defendant produce to Plaintiff's counsel within ten (10) days the Class List which will include the names, dates of employment, all personal addresses, telephone numbers (home and mobile) and all personal email addresses for the class members as defined above in a computer readable format such as Microsoft excel worksheet;

3. Finding that the Notice of Rights and Consent Form are timely, accurate, and informative;

4. Allowing Plaintiff's counsel to mail, email, and text the Notice of Rights and Consent Form to class members within ten (10) days of receiving the Class List from Defendants and send a reminder Notice of Rights and Consent Form via the same methods 30 days after the original mailing to those class members who have not opted into the lawsuit;

5. Allowing the Class Members to electronically execute the Consent Form; and

6. Allowing Class Members to have 60 days from the date of the original mailing to submit their Consent Form to Plaintiff's Counsel in order to participate in this lawsuit unless good cause is found as to why their Consent Form was untimely.

Respectfully submitted,

By: /s/ *Beatriz Sosa-Morris*
Beatriz Sosa-Morris
SOSA-MORRIS NEUMAN, PLLC
BSosaMorris@smnlawfirm.com
Texas State Bar No. 24076154
John Neuman
JNeuman@smnlawfirm.com
Texas State Bar No. 24083560
5612 Chaucer Drive
Houston, Texas 77005
Telephone: (281) 885-8844
Facsimile: (281) 885-8813

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that the foregoing motion was filed on May 18, 2022 through the Western District of Texas CM/ECF system which will provide a copy to all counsel of record.

*/s/ John Neuman*
John Neuman

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with counsel for Defendant about the relief sought in this motion. Defendant is opposed.

*/s/ John Neuman*
John Neuman